THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
DENNIS G. ZOLIDIS, Defendant-Appellant.

First District (5th Division)   No. 82—8

Opinion filed June 17, 1983.

Seiden & Shapiro, of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Michael E. Shabat, Marie Quinlivan, and Harry A. Semrow, Jr., Assistant State's Attorneys, of counsel), for the People.

JUSTICE SULLIVAN delivered the opinion of the court:

After a bench trial, defendant was convicted and sentenced to 10 years for attempted murder. He contends on appeal that (1) the State failed to prove beyond a reasonable doubt that he did not act in self-defense; (2) his claim of self-defense, even if insufficient to warrant acquittal, should have reduced the charge to attempted voluntary manslaughter; and (3) the sentence imposed is excessive.

At trial, John Perez, Jr., testified that he worked as a part-time doorman at a lounge in Crestwood, Illinois. He was not scheduled to work on March 16, 1981, but went to the lounge between 12:30 and 1 a.m. to wait for his fiancee, who was working as a waitress. The lounge closed at 4 a.m., and by that time he had consumed three or four drinks. The only employees present at closing were his girlfriend and a female bartender; there was no doorman on duty, so he, Scott Dellamano, and Richard Darge began asking the 15 remaining patrons to leave. A few left between 4 and 4:15, but defendant, whom he had never seen before, was asked approximately five times to finish his drink and leave and did not comply. The manager of the band was sitting next to defendant, and he (Perez) told them that they had to leave. He did not raise his voice when telling them this and was not upset. Finally, he took defendant's drink away from him, although there was a small amount left in the glass. Defendant then started to leave the lounge, but returned, and he (Perez) again told him that the bar was closed. Defendant said, "Come on," and took a swing at him but missed. At that time, defendant did not have anything in his hand, and he (Perez) was unarmed. He grabbed defendant, and they went out into a hallway where they scuffled for 40 to 50 seconds. He had defendant in a headlock when he (Perez) began falling to the ground, and he noticed that his pants were soaked with blood. Darge grabbed him, laid him on the floor, and told him to stay there. He was hospitalized for 2½ weeks and had surgery to repair knife wounds to his diaphragm, liver, abdomen, lung, and kidney. As a result of the attack and subsequent surgery, he has numerous scars on his abdomen, chest, back, and thigh. He acknowledged that he may have been feeling his drinks, but denied that the amount he drank affected his memory of events that evening. Although he recalled telling officers that he was working that night, he did not remember telling hospital personnel that he had consumed nine to 12 cocktails while at the

lounge. Darge and Dellamano also drank cocktails that night, but he (Perez) did not know whether they had beer mugs or cocktail glasses in their hands when they came into the hallway. He and defendant were alone during the altercation, and at no time did defendant fall to the floor. Defendant was behind him when he (Perez) fell to his knees, but he did not know whether defendant struck him again after the others arrived.

Officer Peterson testified that he called to the lounge at 4:15 a.m. and, when he entered, he saw defendant struggling with two or three other people who were trying to hold him. Perez was on the floor bleeding heavily from his back and leg, and there was a knife on the floor next to him. Defendant was placed under arrest, and a search revealed a leather knife sheath near his right lower back. Defendant had a bruise on his face and was examined and treated at a hospital but not admitted.

Richard Darge testified that he arrived at the lounge at approximately 3:45 a.m. on the night in question and ordered a beer. He recognized defendant, who had been in the lounge once or twice before, as well as Perez and his fiancee, the manager, and Dellamano. When he arrived, Perez was telling patrons it was time to leave. Defendant did eventually leave, but returned immediately and walked up to him and shook hands. When he and Perez again told defendant it was time to leave, he said to Perez, "Well, let's go outside," and started to walk out with Perez following him. There was no physical contact between them in the bar area, but when he (Darge) and Dellamano entered the hallway minutes later, Perez and defendant were fighting. They were both on their feet, and Perez had defendant in a headlock. Perez then began walking away from defendant but immediately fell to his knees. Defendant then put his arm around Perez' neck and stabbed him three or four times in the back. He (Darge) and Dellamano tried to subdue him, but they could not get the knife out of his hand. Darge acknowledged that he and Perez were good friends but denied that Perez was intoxicated when the altercation began. Perez told defendant to leave several times, loudly enough for everyone in the bar to hear. Neither he (Darge) nor Dellamano had a beer mug in their hands when they entered the hallway, and only separated the two men when they saw defendant stabbing Perez.

It was stipulated that, if called, Dr. Gill would testify that Perez suffered 17 stab wounds to his back and extremities. Surgery was required to repair lacerations of his diaphragm, liver, omentum and pneumopericardium.

Dellamano testified that he arrived at the lounge at approximately

1:15 a.m. and consumed five or six drinks between that hour and closing. There were 10 to 12 patrons, including defendant, in the lounge at closing time. Later, he saw defendant in the hallway where he was arguing with Perez, who was trying to get him to leave. Perez and defendant grabbed each other, and they moved into a hallway out of his (Dellamano's) sight. When he saw them again, Perez was facing defendant and holding onto him as if to keep from falling while defendant was stabbing him in the back. He (Dellamano) grabbed defendant, and Perez fell to the floor. He and Darge then wrestled defendant to the floor and disarmed him. Perez was unarmed. Dellamano admitted that Darge and Perez were his friends but denied ever seeing defendant before, arguing with him on a previous occasion, or threatening him with a beer mug. He did not have a beer mug or anything else in his hand when he entered the hallway and had not even been drinking beer that night. There were three men trying to take the knife away from defendant, and he (Dellamano) struck defendant in the face with his fist several times during the struggle. No one else hit or kicked defendant. He denied telling police that he had to pull Perez off defendant in order to break up the fight.

Defendant testified that he went to the lounge on the night in question at approximately 3:55 a.m. Before that, he was at a wedding reception from 10 p.m. until 2 a.m., at a bar at 67th and Kedzie from 2:30 to 3 a.m., and at another bar from 3 until 3:30 a.m. He consumed three or four beers at the reception and one drink at the first bar. Because that bar was a rough place, he took a knife from a tackle box in his trunk and placed it in his belt at the right side of his back before entering. He took the knife into the lounge in Crestwood because he forgot it was there until he was inside. Upon entering the lounge, he sat at the bar talking to the manager of the band. When Perez told them it was time to leave, the manager asked if he could stay until the band left, but Perez said, "I don't give a f--- who you are, you got to go." He (defendant) started to finish his drink but then put it down, stating "F--- this place, they water down their drinks anyway" and left. As he neared the door, he saw Darge and went back to greet him, and Perez then grabbed his arm and started pulling him, saying "how many times do I got to tell you, Buddy, it's time to go." He (defendant) pulled away and started to leave, but Perez followed him and grabbed him when they reached the hallway. When he tried to break free, Perez hit him, and in the struggle both of them fell to the floor. Perez, who was on top of him with his left forearm at his (defendant's) throat, began punching him in the face—striking him six or seven times. Two or three people rushed from the

bar and began kicking him (defendant). He recognized one of them as Dellamano, with whom he had trouble two months previously over a pinball game. At that time, he overheard Dellamano say he would have hit him (defendant) in the head with a beer mug. When Dellamano entered the hallway on the night in question, he had a beer mug in his hand, and he (defendant) was afraid he would get his head bashed in with that mug. When the three or four people continued hitting and kicking him, he pulled out his knife and began stabbing Perez in the back but could not recall how many times he did so. During all of this time, he (defendant) was on his back and Perez was on top of him with his forearm against his throat. As a result of the beating, he had a bruised nose, two black eyes, a bloody lip, and bruises on his head, chest, back, legs, and ankles. He received treatment at the hospital for these injuries but was not admitted. Defendant acknowledged that Perez told him twice to leave and did not raise his voice in doing so. He (defendant) heard other announcements of closing time but did not recall who made them. Although he was upset that he had to leave, he was not angry. He denied stabbing Perez in the back as he fell to the ground.

It was stipulated that a nurse at the hospital would testify if called; that Perez stated he had nine to 12 V.O. and water cocktails on the night in question; that another nurse would testify that defendant suffered a facial injury, scalp contusions and abrasions, a chestwall contusion, and abrasions on his ankles; and that a police officer would testify that Dellamano stated immediately after the incident that he tried to break up the fight by pulling Perez off defendant.

OPINION

Defendant first contends that the State failed to prove beyond a reasonable doubt that he did not act in self-defense. He maintains that the trial court lightly disregarded his exculpatory testimony, which was corroborated in part, unimpeached, and not inherently improbable. Furthermore, he argues, the trial court failed to remember or integrate key facts and testimony into his analysis of what occurred.

Self-defense must be affirmatively raised by a defendant; however, once some evidence is presented on that issue, the State has the burden of proving beyond a reasonable doubt that the defendant did not act in self-defense. (*People v. White* (1980), 90 Ill. App. 3d 1067, 414 N.E.2d 196.) The defense is raised when evidence is presented that unlawful force was threatened against the defendant; that the

danger of harm was imminent; that defendant was not the aggressor; that defendant actually believed that danger existed and that the kind and amount of force used was necessary to avert that danger; and that defendant's beliefs were reasonable. (*People v. Kyles* (1980), 91 Ill. App. 3d 1019, 415 N.E.2d 499.) Should the trier of fact determine that the State has negated any one of these elements beyond a reasonable doubt, then the State has carried its burden of proof. (*People v. Seiber* (1979), 76 Ill. App. 3d 9, 394 N.E.2d 1044.) Moreover, deadly force may be used only where the threatened force will cause death or great bodily harm or is a forcible felony (*People v. Seiber*) and is not justified where the victim, even though initially the aggressor, has been disarmed or disabled (*People v. Limas* (1977), 45 Ill. App. 3d 643, 359 N.E.2d 1194).

■ In the instant case, defendant acknowledges that the issue of self-defense is a question of fact to be resolved by the trial court, and normally, on review, we will not disturb its finding unless the evidence is so improbable or unsatisfactory as to raise a reasonable doubt of guilt. (*People v. Chatman* (1981), 102 Ill. App. 3d 692, 430 N.E.2d 257.) However, defendant asserts that the trial court may not simply reject his testimony thereon as incredible where it is uncontradicted and corroborated in part (*People v. Jordan* (1954), 4 Ill. 2d 155, 122 N.E.2d 209) and presents a reasonable hypothesis of justification (see *People v. Cortez* (1975), 26 Ill. App. 3d 829, 326 N.E.2d 232). This argument assumes that defendant's testimony was wholly uncontradicted, for it is established that the trier of fact is not required to believe an accused's exculpatory testimony (*People v. Adams* (1979), 71 Ill. App. 3d 70, 388 N.E.2d 1326); rather, it must consider the probability or improbability of that testimony, the circumstances surrounding the incident, and the testimony of other witnesses (*People v. Perez* (1981), 100 Ill. App. 3d 901, 427 N.E.2d 229). Where the circumstances and testimony are contradictory, we will not substitute our judgment for that of the trier of fact on questions involving the weight of evidence and the credibility of witnesses (*People v. Hall* (1982), 104 Ill. App. 3d 1064, 433 N.E.2d 1039), since conflicts in evidence are to be resolved by the fact finder (*People v. Rodriquez* (1981), 100 Ill. App. 3d 244, 426 N.E.2d 586), and it is not our function to reweigh facts and redetermine from the record the credibility of the witnesses (*People v. Zagnoni* (1981), 96 Ill. App. 3d 676, 421 N.E.2d 1005).

■ Defendant first argues that there is no support in the record for the trial court's conclusion that he was the aggressor and therefore not entitled to assert a claim of self-defense. We disagree. Perez

testified that when defendant returned to the bar and was again told to leave, he took a swing at him (Perez). Furthermore, Darge testified that defendant said to Perez, "Well, let's go outside," which the trial court apparently interpreted as an invitation to fight. The trial court found these witnesses more credible and correctly concluded that an accused may not seek our a perilous situation, then assert that he acted in self-defense. (*People v. Echoles* (1976), 36 Ill. App. 3d 845, 344 N.E.2d 620.) Defendant's further argument, that the trial court should have found that Perez was the aggressor because the amount of liquor he consumed on the night in question would naturally make him belligerent, is likewise frivolous. Both Perez and Darge testified that Perez was not intoxicated, and defendant himself testified that Perez never raised his voice in telling him to leave, which is corroborated by Perez' testimony that he was not angry or upset. Although defendant maintains that Perez' belligerence is shown by the fact that he was not working that night and therefore had no duty to tell patrons to leave, the trial court may well have found Perez' conduct entirely reasonable under the circumstances. There was no doorman on duty that night to help clear the lounge at closing, and the only other employees present were a waitress and a female bartender.

Defendant further asserts that the trial court could not have found his testimony with regard to how the wounds were inflicted beyond belief, since there was no expert testimony that Perez' wounds could not have been inflicted if the men were in the position defendant described. However, we note that the trial court observed the position of the wounds inflicted, as well as defendant's demonstration of how he—while on his back—reached under his back, pulled out the knife, and proceeded to stab Perez in the back while he was allegedly on top of defendant and pinning him down with a forearm to defendant's throat. The court was further able to observe the size of the two men and determined that defendant's testimony as to what happened was physically impossible. It is obvious, then, that the trial court considered the circumstances in the light of defendant's testimony and found the latter improbable. Since we did not have an opportunity to observe either the physical evidence or the demonstration, we cannot say that its determination is unreasonable or unsatisfactory.

Defendant next argues that the trial court failed to give adequate consideration to the injuries he received. In this regard, it is clear from the record that the trial court gave due consideration to all of the evidence presented on that issue and had seen a picture of defendant taken shortly after the incident in question. It found that the injuries were consistent with those which would have been inflicted by

the struggle to disarm defendant after the stabbing and inconsistent with defendant's testimony that he was beaten and kicked by three or four people. We cannot say that this determination is unreasonable or that, given the testimony here, the existence of the injuries described raises a reasonable doubt as to defendant's guilt.

■ Finally, defendant argues that his testimony shows that he was reasonable in believing that the force used was necessary to protect himself, pointing to his testimony that he was pinned to the ground and being beaten by several people. This testimony, however, is totally contradicted by the testimony of the victim and two eyewitnesses who were apparently found more credible by the trial court, and we will not substitute our judgment in this regard. Defendant also maintains that his version is corroborated by Dellamano's alleged statement shortly after the incident that he had to pull Perez off defendant. However, Dellamano denied making that statement, and it is contradicted by the testimony of two other witnesses. Defendant further asserts that even if we accept the testimony that only he and Perez were involved in the fight, he was still justified in using force. The trial court noted that Perez and defendant were almost identical in age, height, and general build, and it could well have concluded that there was no threat of force which would cause death or great bodily harm such as to justify the deadly force employed by defendant. Moreover, the testimony is clear that defendant continued stabbing the victim in the back after he was disabled and falling to the floor. The latter circumstance in itself negates any claim of self-defense.

We also note that defendant's argument that the trial court "cavalierly" dismissed his testimony and ignored important evidence is totally contradicted by the record before us. The trial court very clearly set forth its conclusions of law and discussed the evidence in a thoughtful, well-reasoned manner. The trial was conducted fairly and impartially, and the trial judge is to be commended for the clear and concise explanation of his ruling.

■ Defendant next contends that even if his claim of self-defense is insufficient for acquittal, that it should have served to reduce the charge to attempted voluntary manslaughter. However, this court has recently held that the crime of attempted voluntary manslaughter based on an imperfect self-defense does not exist in Illinois. (*People v. Reagan* (1982), 111 Ill. App. 3d 945, 444 N.E.2d 742.) There, the court reasoned that the specific intent necessary to sustain a conviction under section 8—4 of the Criminal Code of 1961 (Ill. Rev. Stat. 1979, ch. 38, par. 8—4) is the intent to commit a crime. It went on to

note:

> "To commit an attempted voluntary manslaughter, the defendant could not merely have an intent to kill, for that is not a crime. [Citation.] The defendant would have to specifically intend to kill with an unreasonable belief in the need to use deadly force in self-defense. *** If a defendant intended to kill with the knowledge that such action was unwarranted, he has intended to kill without lawful justification and could be prosecuted for attempted murder. In the case at bar, the defendant intended to defend himself, although his belief in the need to defend himself or in the need to use deadly force was unreasonable, his intent was not to commit a crime. His intent was to engage in self-defense, which is not a criminal offense." (111 Ill. App. 3d 945, 951, 444 N.E.2d 742, 746.)

The court also stated that the compromise between attempted murder and exoneration where an imperfect self-defense claim exists is aggravated battery or aggravated assault, not attempted voluntary manslaughter.

Furthermore, even if such an offense did exist, its application is not warranted by the facts before us. Defendant's argument assumes that the trial court rejected his self-defense claim solely because it found unreasonable his belief that force was necessary, or that deadly force was justified by the danger presented. As we noted above, however, the trial court also found that defendant was the aggressor in this incident. That finding is amply supported by the record and precludes any reliance on self-defense, regardless of the reasonableness of defendant's beliefs. "A defendant cannot claim self-defense where the situation he encounters arises out of his own making." (*People v. Andersch* (1982), 107 Ill. App. 3d 810, 819, 438 N.E.2d 482, 488.) Moreover, the testimony of Darge and Dellamano, which the court found credible, established that defendant repeatedly stabbed the victim in the back as he was falling to the floor, already seriously wounded. Such conduct negates any belief on defendant's part, reasonable or otherwise, that his actions were necessary to defend himself.

■ Finally, defendant contends that the sentence imposed was excessive. He asserts that the trial court placed undue emphasis on the nature of the offense while giving little regard to factors indicative of his potential for rehabilitation. In particular, he maintains that the trial court failed to consider his stable work record and lack of prior criminal involvement in reviewing factors in mitigation.

Determination of the sentence to be imposed is a matter of judi-

cial discretion, and where the sentence is within statutory limits, the trial court's decision will not be disturbed absent an abuse of that discretion (*People v. La Pointe* (1981), 88 Ill. 2d 482, 431 N.E.2d 344; *People v. Shumate* (1981), 94 Ill. App. 3d 478, 419 N.E.2d 36); that is, unless the sentence fails to reflect "the seriousness of the offense and [give] adequate consideration to the rehabilitative potential of the defendant." (*People v. Carlson* (1980), 79 Ill. 2d 564, 587, 404 N.E.2d 233, 243.) Because of this great deference given to the trial court's decision, a rebuttable presumption exists that the sentence imposed is proper (*People v. Kloiber* (1981), 95 Ill. App. 3d 1061, 420 N.E.2d 870), and the defendant must affirmatively show that the sentence was based on improper considerations (*People v. Walter* (1980), 90 Ill. App. 3d 687, 413 N.E.2d 542) or is otherwise erroneous in his particular situation (*People v. White* (1980), 86 Ill. App. 3d 19, 407 N.E.2d 572).

Attempted murder is a Class X felony, for which a sentence of not less than six nor more than 30 years is statutorily mandated. (Ill. Rev. Stat. 1979, ch. 38, pars. 8—4(c)(1), 1005—8—1(a)(3).) Since the sentence imposed is within the lower range of the statutory limits, defendant must show that it is based on improper considerations or is somehow inappropriate in his case. We have studied the record and find that, contrary to defendant's assertion, the sentence imposed was the result of a thoughtful, well-reasoned attempt to match the sentence to the criminal as well as to the crime. The record shows that the trial court specifically considered the applicability of each mitigating factor, including defendant's work record and lack of prior criminal record, as well as aggravating factors, including the nature of the crime, as it is required to do. (Ill. Rev. Stat. 1979, ch. 38, pars. 1005—4—1, 1005—5—3.1, 1005—5—3.2.) Not only did the court mention the factors relied on by defendant, but it clearly accorded them great weight in imposing sentence, since it found that the exceptionally brutal nature of defendant's conduct was indicative of wanton cruelty which would have justified an extended term of 30 to 60 years. In the light of the thoughtful consideration evident from this record, it is our view that the trial court did not abuse its discretion in imposing a 10-year sentence.

For the foregoing reasons, the judgment of the trial court is affirmed.

Affirmed.

WILSON, P.J., and LORENZ, J., concur.