# Illinois Official Reports

## Appellate Court

*People v. Scott*, 2015 IL App (1st) 131503

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JOSEPH SCOTT, Defendant-Appellant. |
| District & No. | First District, Second Division<br>Docket No. 1-13-1503 |
| Filed<br>Modified upon<br>denial of rehearing | June 30, 2015<br><br>September 15, 2015 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 11-CR-5133; the Hon. Mary Margaret Brosnahan, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Michael J. Pelletier and Patrick F. Cassidy, both of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Mary P. Needham, and Jocelyn M. Schieve, Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE HYMAN delivered the judgment of the court, with opinion.<br>Justices Pucinski and Mason concurred in the judgment and opinion. |

**OPINION**

¶ 1 Following a jury trial, defendant Joseph Scott was found guilty of second degree murder of Justin Grover and sentenced to 18 years' incarceration. Scott contends that he was denied effective representation because: (i) defense counsel did not present Jermaine Cummings' robbery conviction as *Lynch* character evidence to support Scott's claim of self-defense (*People v. Lynch*, 104 Ill. 2d 194 (1984)); (ii) defense counsel failed to object to the State's inaccurate statement during rebuttal argument that Scott waited three years to assert self-defense; and (iii) defense counsel failed to object to Scott's impeachment by Scott's prior aggravated unlawful use of a weapon (AUUW) conviction under a statute later ruled unconstitutional by the Illinois Supreme Court in *People v. Aguilar*, 2013 IL 112116.

¶ 2 We reject each of these contentions. First, Scott's arguments are forfeited; forfeiture aside, we determine that Scott was not prejudiced by counsel's inactions, and, therefore, his ineffective assistance of counsel argument fails the second prong of the *Strickland* test.

¶ 3 Scott also argues that in sentencing him to 18 years' imprisonment, the trial court failed to consider statutory mitigating factors and improperly relied on his AUUW conviction as an aggravating factor. We conclude that the trial court did not abuse its discretion in sentencing Scott. The record reflects that the trial court properly considered mitigation and entered a sentence less than the maximum allowed by statute. Furthermore, the trial court specifically stated it considered Scott's record after he was released from parole.

¶ 4 BACKGROUND

¶ 5 Scott was charged by indictment with 24 counts of first degree murder of Justin Grover (720 ILCS 5/9-1(a) (West 2008)); 3 counts of attempted first degree murder of Jermaine Cummings (720 ILCS 5/8-4(a), 9-1(a)(1) (West 2008)); and 1 count of aggravated discharge of a firearm (720 ILCS 5/24-1.2(a)(2) (West 2008)). Scott moved to admit evidence of various convictions and arrests of Grover and Cummings. Immediately before jury selection, the State nol-prossed 17 of 24 counts of first degree murder of Justin Grover and all charges related to Cummings. Defense counsel then stated: "We will not call that witness then," apparently referring to the police witness regarding Cummings' prior convictions.

¶ 6 Over the defense's objection, the trial court granted the State's motion *in limine* to impeach Scott with his AUUW conviction on January 29, 2008, should he testify at trial.

¶ 7 On the afternoon of May 31, 2009, Scott, Justin Grover, Jermaine Cummings, and Scott's brother, James Scott, were selling marijuana out of a second-floor apartment in a building in Chicago's Englewood neighborhood. An argument among them escalated to a fistfight. Henry Scott, another brother who was watching the fight with other bystanders, pulled out a gun. The fight ended after Scott grabbed the gun from Henry and shot at Grover and Cummings, hitting Grover in the head and thigh. Cummings was not shot. Grover died at the scene.

¶ 8 Jermaine Cummings testified that, in May 2009, he made his living selling "nickel bags" of marijuana. On May 31, Cummings and Grover, along with Scott and James, were selling marijuana from the apartment when Grover and James began to argue about transactions. The argument quickly moved downstairs and outside in front of the building. Cummings followed them outside and tried to stop the argument. Scott then came downstairs and also tried to

intervene. Grover began to argue with Scott. When Grover and Scott started to shove each other, Cummings and James attempted to break up the fight by standing between them. Cummings and James began fighting; Cummings pulled out a gun and swung it at James, then gave the gun to a bystander and began fistfighting with James. They stopped fighting after several minutes. Cummings grabbed Grover and pulled him toward the door of the building. Thereafter, Scott and James stood right in front of Cummings and Grover and continued arguing with them. Henry then "popped up," pulled out a gun, and pointed it at Cummings. Cummings asked Henry if he was going to shoot the gun, and then Grover told him to shoot. Henry said nothing and did not shoot.

¶ 9 Scott "snatched" the gun from Henry and shot three times. Thinking Grover was next to him, Cummings ran away, but when he turned around he noticed Grover lying on the ground where they had been standing. Cummings returned to chase James, who had run. Cummings caught him and started fighting. The police arrived and took them both to the station.

¶ 10 Cummings denied making threats or threatening movements and testified that he did not see Grover make threats or threatening movements.

¶ 11 On cross-examination, Cummings stated he carried a gun for protection. Grover was "mad" and threatening James because he thought James had stolen some of his marijuana. Cummings did not remember telling two detectives on the day of the shooting that Grover "whooped [Scott's] ass."

¶ 12 Cummings also testified that he was sentenced to prison in 2011 for the unlawful use of a weapon by a felon and, at the time of trial, remained incarcerated; in 2007, he was sentenced to three years in prison for possession of a stolen motor vehicle; and in 2003, he was sentenced to probation for robbery but in 2004, after violating his probation, the court resentenced him to a prison term.

¶ 13 Simone Priest testified that in May 2009 she had been dating Grover for two or three years; they had a one-year-old daughter. On May 31, while walking to pick up the daughter, she and Amber McCorkle saw Grover and Cummings and spoke to them for a few minutes. Ten or fifteen minutes later, on their way back, the women heard arguing and saw Cummings, Grover, Scott, James, and Henry standing together. Henry faced Grover, Cummings was next to Grover, and James and Scott stood nearby. Priest said she was 10 to 12 feet away. Henry was pointing a gun at Grover. She heard Grover say "bust it" twice, but Henry did not shoot. Scott snatched the gun from Henry and started shooting at Grover. Priest heard four or five shots. She ran away, carrying her daughter in her arms, but then gave her daughter to someone standing nearby and ran back to Grover, who died shortly after.

¶ 14 Amber McCorkle was walking with Priest after picking up Priest's daughter when they heard male voices arguing. McCorkle saw Grover arguing with Henry and Scott. McCorkle heard gunshots but did not see the actual shooting. After the gunshots stopped, McCorkle saw Priest tending to the mortally wounded Grover.

¶ 15 The parties stipulated that Henry's hands tested negative for gunshot residue, indicating that he did not shoot a gun.

¶ 16 Scott testified that in May 2009 he was 21 years old, living with his mother, and unemployed. He supported himself selling marijuana. On May 31, Scott sold marijuana with his younger brother, James, Grover, and Cummings. Grover left the apartment building for a short time. While he was gone, he expected James to sell both Grover's and James'

inventory. Grover returned to find that James had sold only his own. Grover became upset and started yelling at James. The dispute went outdoors. Scott was protective of James and stepped between Grover and James. Grover then punched Scott in the face and they began to fistfight. Cummings appeared and pulled a gun from his pocket. James and Cummings then argued; Scott did not see Cummings with a gun at that point. Henry stood in the crowd of 70 to 80 people watching. Grover and Scott stopped fighting but continued to argue when Henry pulled out a gun. Cummings was behind Grover. Scott grabbed the gun from Henry and shot "two to three times" because Cummings looked like he was going for the gun he had brandished earlier.

¶ 17    Scott did not intend to kill Grover or Cummings. He shot at them because in his experience, once Henry pulled out the gun, "they'll shoot their gun."

¶ 18    After the defense rested, the State introduced a certified statement of Scott's AUUW conviction on January 29, 2008.

¶ 19    The jury was instructed as follows: "[e]vidence that a witness has been convicted of an offense may be considered by you only as it may affect the believability of the witness."

¶ 20    During deliberations, the jury sent a note to the trial court requesting a transcript of Scott's testimony. Neither the State nor Scott objected, and the trial court sent the transcript to the jury room.

¶ 21    The jury returned a verdict of guilty of second degree murder.

¶ 22    At Scott's sentencing hearing, the State introduced Scott's prior conviction in 2007 on a misdemeanor for resisting arrest and a Class 4 felony possession of a controlled substance for which he received probation for the felony conviction. Also, the State introduced Scott's 2008 probation violation for which he pleaded guilty to AUUW, a Class 4 felony, under the statute later found unconstitutional by the Illinois Supreme Court in *People v. Aguilar*, 2013 IL 112116. 720 ILCS 5/24-1.6(a)(1) (West 2008). Scott had spent one year imprisoned before his release weeks before this incident.

¶ 23    The State read a victim impact statement from Grover's brother and Simone Priest, both addressing the effect of Grover's death on his young daughter. In mitigation, Scott's fiancée testified that she was pregnant at the time of his arrest and that their daughter had limited contact with Scott because of his incarceration.

¶ 24    The trial court sentenced Scott to 18 years' imprisonment, based on all the factors in aggravation and mitigation. The trial court referenced Scott's revocation of probation that resulted in a one-year prison sentence, remarking that Scott had "a very significant and escalating criminal background in [a] very short amount of time."

¶ 25    Scott's motion to reconsider sentence included an assertion that the trial court improperly considered Scott's AUUW conviction in aggravation.

¶ 26                                                    ANALYSIS
¶ 27                                    Ineffective Assistance of Counsel
¶ 28    Under the "strict" test of *Strickland v. Washington*, 466 U.S. 668, 687 (1984), a defendant arguing ineffective assistance of counsel must show, in addition to a deficient performance below an objective standard of reasonableness, that the defendant suffered prejudice as a result. *People v. Houston*, 226 Ill. 2d 135, 143 (2007). A failure to satisfy both prongs precludes a finding of ineffective assistance. *People v. Patterson*, 192 Ill. 2d 93, 107 (2000).

To satisfy the prejudice prong, defendant must show that but for counsel's deficient performance, a reasonable probability exists that the result of the proceeding would have been different. *People v. Evans*, 209 Ill. 2d 194, 219-20 (2004). We may dispose of defendant's ineffective assistance claim by proceeding to the prejudice prong alone. *People v. Hale*, 2013 IL 113140, ¶ 17. Here, even if we assum*e arguendo* that counsel's inaction constitutes deficient performance, we find no prejudice.

¶ 29    Scott alleges three bases for his claim of ineffective representation; the State responds that all three were strategic decisions made by defense counsel and did not cause prejudice.

¶ 30                                                    *Lynch* Evidence

¶ 31    Scott's first assertion of ineffective assistance turns on the failure of defense counsel to pursue evidence of Cummings' violent character. The State charged Scott with first degree murder of Justin Grover and attempted murder of Cummings. Before trial, defense counsel, in support of Scott's claim of self-defense, moved that Cummings' prior robbery conviction be admitted to show his aggressive and violent character, as allowed by *People v. Lynch*, 104 Ill. 2d 194 (1984). The trial court had yet to rule on this motion when the State nol-prossed the charges involving Cummings as a victim. Defense counsel then abandoned the motion.

¶ 32    The Illinois Supreme Court's opinion in *Lynch* commands that "when the theory of self-defense is raised, the victim's aggressive and violent character is relevant to show who was the aggressor, and the defendant may show it by appropriate evidence." *Id.* at 200. This evidence may include convictions for crimes of violence. *Id.* A defendant affirmatively raises the issue of self-defense by presenting some evidence regarding: (1) the threat of unlawful force against defendant; (2) an imminent danger of harm; (3) an aggressor other than defendant; (4) the belief by defendant that danger existed and to avert danger, the kind of force used was necessary; and (5) the belief was reasonable. *People v. Rivera*, 255 Ill. App. 3d 1015, 1023 (1993). Once defendant presents the facts supporting self-defense, the burden of disproving the existence of justification beyond a reasonable doubt passes to the State. *Id.*

¶ 33    The State characterizes Cummings' testimony as "nearly identical" to Scott's and maintains their accounts agree. The events leading up to the shooting are not in dispute. An argument between two friends migrated outside and then escalated into a fistfight involving four individuals. In the course of the argument, Cummings pulled a gun with which he attempted to hit James. A crowd of onlookers formed, including Henry, a Scott brother. After Henry produced a gun, the mutual combat situation became deadly.

¶ 34    But conflicting testimony emerged regarding whether Cummings had a gun when Scott grabbed Henry's gun. Scott testified that he shot "two to three times" because Cummings, who was behind Grover, looked like he was going for the gun Scott saw him with earlier, and that Cummings admitted having. Scott stated that he did not intend to kill either Grover or Cummings, but that he shot at them because in his experience, once Henry pulled out his gun, "they'll shoot their gun." On the other hand, Cummings testified that he gave the gun away after trying to hit James with it. Thus, the testimony of Scott and Cummings conflicted on an essential point and Scott's claim of self-defense was sufficiently raised.

¶ 35    We turn to the question of defense counsel's failure to pursue the motion *in limine* to demonstrate Cummings' violent character with evidence of his armed robbery conviction. Scott argues that he was prejudiced by his counsel's failure. It is true that had defense counsel pursued the *Lynch* motion, and the trial court granted it, the jury would have been

informed about Cummings' armed robbery conviction, and would have received the proper instruction regarding its application as evidence of Cummings' character. While that evidence was never presented to the jury, Cummings testified to his being a convicted felon who had been imprisoned three different times for different offenses, including violation of probation. During cross-examination, Cummings admitted to carrying a gun for protection. He also stated that he pulled a gun during the fight and attempted to hit James with it, but missed. Grover was "mad" and threatening James. Cummings' version of the events did conflict with Scott's, as noted above, but the credibility of each witness was for the jury to determine. Given this evidence, we find that the jury heard extensive evidence about Cummings' role in the fight. It is the responsibility of the trier of fact to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences therefrom. *People v. Brown*, 2013 IL 114196, ¶ 48. This court does not substitute its judgment for that of the trier of fact on issues involving the weight of the evidence or the credibility of the witnesses. *Id*. The jury listened to Cummings and observed his demeanor. We fail to see how defense counsel's pursuit of the *Lynch* motion, assuming it was successful, would have produced a change in the trial's outcome.

¶ 36      In addition to the testimony about the murder, Cummings testified that he was convicted and sentenced to prison in 2011 for the unlawful use of a weapon by a felon and, at the time of trial, remained incarcerated. In 2007, he was sentenced to three years in prison for possession of a stolen motor vehicle; and in 2003, he was sentenced to probation for robbery but in 2004, after violating his probation, the court resentenced him to a prison term. The jury's instruction that "evidence that a witness has been convicted of an offense may be considered by you only as it may affect the believability of the witness" limited the evidence of Cummings' prior convictions as probative of his credibility, not as proof of his violent character.

¶ 37      Moreover, Scott's argument that the jury's note requesting a transcript of Scott's testimony indicated a "reasonable probability" the jury would have found the State did not meet its burden of disproving self-defense is mere speculation. We will not assume that this request indicates the jury's indecision as opposed to attention to detail (the "jury's clear focus on Scott's testimony" as stated in his brief). See *People v. Banks*, 287 Ill. App. 3d 273, 288 (1997) (jury's written query during deliberations could have as easily evidenced its careful consideration of all evidence leading to its guilty verdict as it could have indicated jury confusion).

¶ 38      Therefore, we do not find any "reasonable probability that the result of the proceeding would have been different" had defense counsel pursued the motion *in limine* seeking to introduce *Lynch* evidence. *Evans*, 209 Ill. 2d at 220.

¶ 39                                  Scott's Prior Conviction

¶ 40      In January 2008, Scott was convicted of AUUW, a Class 4 felony, under the statute later ruled unconstitutional by the Illinois Supreme Court in *People v. Aguilar*, 2013 IL 112116. 720 ILCS 5/24-1.6(a)(1) (West 2008). At trial in 2011, after Scott testified, the State introduced a certified copy of the conviction. Over defense counsel's objection, the trial court granted the State's motion *in limine* to impeach Scott with his AUUW conviction on January 29, 2008, but Scott did not preserve his objection in his amended motion for a new trial.

¶ 41    A contemporaneous objection during the trial will not preserve an issue for review; the defendant also must raise the issue in a written posttrial motion so as to give the court an opportunity to grant a new trial, if the relief would be warranted. See *People v. Lewis*, 223 Ill. 2d 393, 400 (2006); *People v. Enoch*, 122 Ill. 2d 176, 186 (1988) ("*Both* a trial objection *and* a written post-trial motion raising the issue are required for alleged errors that could have been raised during trial." (Emphases in original.)). Thus, Scott forfeited the issue. The question presented, then, becomes the effect of defense counsel's failure to include the objection in the amended motion for a new trial.

¶ 42    Where the error complained of rises to constitutional magnitude, the error cannot be denominated harmless unless it is harmless beyond a reasonable doubt. *People v. Martin-Trigona*, 111 Ill. 2d 295, 304 (1986). In *Martin-Trigona*, the Illinois Supreme Court held that convictions obtained in violation of a constitutional right (*e.g.*, right to counsel) cannot be used for impeachment purposes. Impeachment by the use of a void conviction, here Scott's AUUW conviction, cannot be justified; nevertheless, as we explained in *People v. Woollums*, 143 Ill. App. 3d 814 (1986):

> "We must therefore assume that the introduction of the conviction at trial was error, but the more important question is whether it was reversible error. We think not. A reviewing court may find that the denial of a Federal constitutional right did not contribute to a defendant's conviction, provided it can determine that the error was harmless beyond a reasonable doubt. (*Chapman v. California* (1967), 386 U.S. 18 ***.) That is precisely the situation here." *Id*. at 815-16.

The jury knew of Scott's conviction by way of the admission of a certified copy after Scott testified and the defense rested. He was not cross-examined about it, nor did the State argue that Scott's credibility had been impeached as a result of the conviction. The jury instruction given regarding credibility of witnesses appears general and short, specifically stating that evidence of "a defendant's prior conviction" must not be considered as evidence of guilt of the charged offense. Under these circumstances, we are convinced any error was harmless beyond a reasonable doubt.

¶ 43                              Prosecutorial Misconduct

¶ 44    Prosecutors are afforded wide latitude in closing argument. In reviewing comments made at closing argument, this court asks whether or not the comments made at closing argument "engender substantial prejudice against a defendant such that it is impossible to say whether or not a verdict of guilt resulted from them." *People v. Wheeler*, 226 Ill. 2d 92, 123 (2007). We view the closing arguments of both the prosecutor and the defense attorney as a whole for context rather than focus on particular phrases or remarks. See *Perry*, 224 Ill. 2d at 347. To warrant reversal and a new trial, the improper remarks in closing argument must constitute a material factor in defendant's conviction. See *Wheeler*, 226 Ill. 2d at 123.

¶ 45    Scott asserts prejudicial error occurred during the State's rebuttal argument when it argued that Scott fabricated his self-defense theory at trial three years after the shooting. While it is true that the prosecutor's waiting until rebuttal argument deprived defense counsel of the chance to respond, we do not believe this remark constitutes a material factor in the jury's verdict of guilty of second degree murder. See *id*. The verdict of guilty of second degree murder indicates the jury accepted at least one proposition supporting the lesser-included offense: either that Scott acted "under a sudden and intense passion resulting

from serious provocation by the deceased" or that he believed that circumstances existed which would justify the deadly force he used, even if that belief was unreasonable. This, together with the jury request for a transcript of Scott's testimony, necessarily indicates that the jury rendered a considered verdict. We do not find substantial prejudice resulted.

¶ 46    In conclusion, Scott has not established prejudice or shown a reasonable probability that, but for counsel's deficient performance, the jury would have acquitted him.

¶ 47                                    Excessive Sentence

¶ 48    The trial court must consider all factors of mitigation and aggravation. *People v. McWilliams*, 2015 IL App (1st) 130913, ¶ 27. Appellate courts treat sentencing decisions within the statutory range with great deference. *People v. Hill*, 408 Ill. App. 3d 23, 29 (2011). We reduce a sentence when the record shows that the trial court abused its discretion. *People v. Streit*, 142 Ill. 2d 13, 19 (1991). The reviewing court may not reverse the sentencing court just because it would have weighed the factors differently. *Id.*

¶ 49    The sentencing range for second degree murder is a determinate sentence of not less than 4 years and not more than 20 years. 730 ILCS 5/5-4.5-30 (West 2010). Scott asks that his sentence of 18 years' imprisonment be reduced because the trial court relied on his void prior conviction for AUUW as an aggravating factor. As noted above, Scott had been convicted of AUUW under the statute later found unconstitutional by the Illinois Supreme Court. See *People v. Aguilar*, 2013 IL 112116.

¶ 50    On point is the decision in *People v. Ware*, 2014 IL App (1st) 120485, which held: "based on this record, we see no reason to remand for resentencing based on a claim that two of defendant's prior convictions may now be void under *Aguilar*. Neither of the prior convictions for AUUW was an element of the charged offenses (compare *People v. McFadden*, 2014 IL App (1st) 102939), and neither conviction served as a basis for any statutory enhancement or extended-term sentence in this case." *Id.* ¶ 35. As in *Ware*, the sentencing court considered all statutory factors in mitigation and aggravation, as well as "all the information contained in the presentence investigation as it [is] amended." The trial court enumerated the factors in mitigation and aggravation, addressing each in turn.

¶ 51    We find *People v. Fischer*, 100 Ill. App. 3d 195 (1981), cited by Scott, distinguishable. In *Fischer*, the defendant asserted that the trial court relied on an improper factor in sentencing him to seven years' imprisonment for voluntary manslaughter. *Id.* at 199. The defendant pointed out that, at the sentencing hearing, the court heard that the defendant had a prior conviction for possession of marijuana, and that the statute under which the defendant previously had been convicted was later declared unconstitutional. *Id.* at 199-200. The *Fischer* court held that the sentencing court abused its discretion by improperly relying on the marijuana conviction. *Id.* at 200. But, in *Fischer*, the trial court knew at the time of sentencing that the statute had been declared unconstitutional, yet relied on the void conviction in sentencing. *Id.* Scott's sentence occurred on February 22, 2013, seven months before our supreme court issued its decision in *Aguilar*. Thus, *Fischer* is inapposite.

¶ 52    Scott also argues that the trial court failed to consider statutory mitigating factors. We presume a trial court has considered all of the relevant factors in mitigation before it, and without affirmative evidence that the sentencing court failed to consider factors in mitigation, that presumption cannot be overcome. *People v. McWilliams*, 2015 IL App (1st) 130913, ¶ 27. We find that the trial court did not refuse or fail to consider the mitigating factors.

¶ 53       As already noted, the trial court took the time and effort to give reasons for its ruling regarding each mitigating and aggravating factor. Specifically addressing the mitigating factors, the trial court explained that in its view "strong provocation" did not exist (730 ILCS 5/5-5-3.1(a)(3) (West 2008)) because a bar or street fight does not constitute strong provocation to mitigate a shooting. The mitigating circumstances of mutual combat and self-defense already factored into the jury's verdict of the lesser offense of second degree murder. See *People v. Garibay*, 366 Ill. App. 3d 1103, 1110 (2006) (defendant's plea of guilty to second degree murder apparently based on theory of mutual combat, one of recognized forms of "serious provocation" sufficient to reduce first degree murder to second degree murder). In determining an appropriate sentence, "[t]he mere fact that a defendant acts under a strong provocation should be entitled to little or no weight because it does not differentiate him or her from any other defendant convicted of second degree murder" under the statute. (Emphasis omitted.) *Id*. But, the *Garibay* court continued: "On the other hand, *the nature and extent* of the provocation in a particular case" could be germane to the sentencing decision. (Emphasis in original.) *Id*. "Consideration of circumstances that are necessarily present in every instance of a particular offense–*whether aggravating or mitigating*–would undermine individualized sentencing and would tend to skew sentencing decisions systematically toward one end or the other of the range established by the General Assembly." (Emphasis added.) *Id*.

¶ 54       Scott criticizes *Garibay* and urges us to follow *People v. Hall*, 159 Ill. App. 3d 1021 (1987), decided 20 years earlier. There, we found that the trial court erred in stating that it would not consider, for purposes of sentencing, mitigating factors which reduced the murder charge to voluntary manslaughter. *Id*. at 1032. The *Hall* opinion quoted the trial court's remarks during the sentencing hearing: " 'Credit has already been given to Mr. Hall for those mitigating factors that reduce this crime down from murder to voluntary manslaughter and it is not the intent of this Court to let him use those chips twice.' " *Id*. at 1031. Thus, in *Hall*, the trial court erred when it refused to consider this mitigating factor. That error, however, was harmless because the trial court properly considered other mitigating and aggravating factors. *Id*.

¶ 55       Here, the trial court did not find "substantial grounds tending to excuse or justify the defendant's criminal conduct" (730 ILCS 5/5-5-3.1(a)(4) (West 2008)). The record does not reflect that the trial court refused to consider this mitigating factor, but elected to give it little weight, which, under the circumstances presented here, it was entitled to do. Similarly, section 5-5-3.1(a)(7) of the statute addresses whether a defendant has no history of prior delinquency or criminal activity or has led a law-abiding life for a substantial period of time before the commission of the crime for which he or she is being sentenced (730 ILCS 5/5-5-3.1(a)(7) (West 2008). The trial court stated that it would not weigh Scott's misdemeanor conviction from 2007 very significantly, noting that Scott received probation for a Class 4 possession of a controlled substance conviction, violated his probation with the AUUW conviction, was sentenced to prison, and less than two months after his release from prison, was charged with murder. The sentencing court placed no emphasis on the AUUW conviction itself; rather, it relied on Scott's pattern of behavior after his release from parole; *i.e.*, less than two months later, Scott was selling drugs, admittedly buying guns, and entering into a fatal street brawl.

¶ 56    Therefore, we find the sentencing court did not abuse its discretion by imposing the 18-year sentence, even though near the upper range of permissible sentences. As noted in *Hall*, primary factors in sentencing are "the gravity of the offense and the circumstances surrounding its commission." *Hall*, 159 Ill. App. 3d at 1031. Ultimately, a reviewing court may not reweigh aggravating and mitigating factors in reviewing a defendant's challenge to his or her sentence, and it may not substitute its judgment for the trial court merely because it could or would have weighed the factors differently. *People v. Jones*, 376 Ill. App. 3d 372, 394 (2007). Accordingly, we affirm Scott's sentence.

¶ 57                                        CONCLUSION
¶ 58    We affirm the circuit court.

¶ 59    Affirmed.